## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, John R. Dunn, being sworn, state:

### Introduction and Agent Background

1.     I am a Task Force Officer ("TFO") of the U.S. Drug Enforcement Administration (the "DEA") and have been so employed since January 2022.  I am also a Trooper with the Massachusetts State Police ("MSP") and have been so employed since 2017.  My current assignment with the DEA is with the Boston Tactical Diversion Squad ("TDS").

2.     I have participated in investigations relating to the distribution of controlled substances, including fentanyl, methamphetamine, cocaine, and other substances in violation of the federal drug laws, including Title 21, United States Code, Sections 846 and 841(a)(1), and the drug laws of Massachusetts. I have received training in the field of narcotics enforcement and investigations. I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

3.     Through my training, education, and experience, I have become familiar with the way illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs. I am familiar with the common appearance, packaging, texture, and smell of narcotics including fentanyl, methamphetamine, and other illegal drugs. I have debriefed defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operations of narcotics trafficking organizations.

4.     Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity.  I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to effectively market those drugs to customers.  I understand illegal drug trafficking often involves the local, interstate, and international movement of illegal drugs to distributors and co- conspirators

at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors and money launderers.

5. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. Drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.

6. I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the street terms used by drug traffickers, as well as the methods they use to disguise conversation and operations.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

8. I submit this affidavit in support of applications for warrants authorizing agents to search the following electronic equipment:

      a. A silver iPhone in a clear/brown case, seized from the ground underneath a gray Honda Accord, Mass. Reg. 3YEM63, in the parking lot of 100

Winthrop Ave., Lawrence, Mass., on August 27, 2025, as further described in Attachment A-1 (the "clear/brown-case iPhone");

b. An iPhone in a patterned black case seized from a gray Honda Accord, Mass. Reg. 3YEM63, in the parking lot of 100 Winthrop Ave., Lawrence, Mass., on August 27, 2025, as further described in Attachment A-2 (the "black-case iPhone").

9.      This Affidavit refers to the two items described in Attachments A-1 and A-2 collectively as the "Electronic Equipment."  The Electronic Equipment is currently in the custody of the DEA at 40 Middlesex Turnpike, Bedford, MA 01730.  From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that the Electronic Equipment has been stored in a way in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Electronic Equipment first came into investigators' possession.

10.      I also make this affidavit in support of applications for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for historical cell-site information regarding:

a. the mobile phone assigned call number 978-390-7369, subscribed to Randy R. Recinos, 120 Phillips St., Lawrence, Mass. 01843 (the "7369 Phone"). The service provider for the 7369 Phone is T-Mobile USA, Inc., a wireless service provider that accepts service of process at 4 Sylvan Way, Parsippany, NJ 07054 ("T-Mobile").  The 7369 Phone is further described in Attachment C.  The requested historical cell site data is described in further detail below and in Attachment D.

11.      As set forth below, there is probable cause to believe that the Electronic Equipment contains evidence, fruits, and instrumentalities of violations of federal law, including violations of

3

21 U.S.C. §§ 841(a)(1) & 846 (narcotics trafficking and conspiracy to commit same) (the "Target Offenses"). There is also probable cause to believe that Randy RECINOS committed the Target Offenses. There is also probable cause to believe that the historical cell-site information described in Attachment D will constitute evidence of the Target Offenses and will lead to the identification and location of those who committed them. As described below, historical cell-site location information for the 7369 Phone will assist investigators with confirming RECINOS's participation in the TARGET OFFENSES and in identifying co-conspirators and potentially identifying locations used to store drugs and drug proceeds.

## PROBABLE CAUSE

12.    On August 28, 2025, the Hon. Donald L. Cabell, Chief U.S. Magistrate Judge, District of Massachusetts, signed a Complaint charging Randy RECINOS with Distribution of and Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1); and Distribution of and Possession with Intent to Distribute 50 Grams or More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B)(viii). *See* M.J. No. 25-1298-DLC. I submitted an affidavit in connection with that complaint that is attached as Attachment E (the "complaint affidavit"). I hereby incorporate the complaint affidavit by reference and do not repeat here all the facts recited in that document.

*August 2024 – August 2025: RECINOS Used the 7369 Phone to Sell to a Cooperating Source Counterfeit Pills Containing Methamphetamine and Fentanyl*

13.    As stated in greater detail in the complaint affidavit, the charges against RECINOS related to the DEA using a cooperating source (the "CS") to perform controlled purchases of counterfeit pills from RECINOS. Qualifying information about the CS is described in the complaint affidavit. Between August 2024 and August 2025, the CS performed eleven controlled purchases of counterfeit pills from RECINOS in Methuen and Lawrence. The counterfeit pills that RECINOS sold to the CS during the first three controlled buys were found to lack any

controlled substance. Afte the CS complained, the counterfeit pills that RECINOS sold to the CS during the subsequent eight controlled purchases were found to contain methamphetamine and fentanyl. In all, the CS bought approximately 1,080.59 grams of substances containing methamphetamine, and 775 grams of substances containing fentanyl, from RECINOS. The CS also bought a small amount of cocaine (3.5 grams) from RECINOS.

14. The CS set up the eleven controlled buys by contacting RECINOS via WhatsApp. The CS used a contact saved in the CS's WhatsApp application as "Dinero," which the CS knew to be RECINOS's contact. Investigators preserved the CS's WhatsApp text messages with "Dinero" setting up the eleven deals. "Dinero" in WhatsApp had telephone number 978-390-7369 (i.e., the 7369 Phone). This phone number was subscribed to RECINOS.



15.     For instance, on June 11, 2025, RECINOS ("Dinero") texted the CS on WhatsApp, "I got like 2600 . . . Blues im tryna offload . . . If you know anybody."  Based on my training and experience, and RECINOS's subsequent sale of counterfeit oxycodone pills to the CS, I believe "blues" referred to counterfeit oxycodone pills containing fentanyl that RECINOS wished to sell. Days later, on June 16, the CS asked, "You still go the. Blues," to which RECINOS responded, "Yeah brody."[1]  The following day, June 17, RECINOS came to a meeting site in Lawrence to sell

---

[1] The communications between RECINOS and the CS were in English.  Typos are as written.

the "blues" to the CS, as agreed with the CS.  There, RECINOS sold blue pills to the CS that were later tested at a DEA laboratory and found to be 1,142 pills containing fentanyl and weighing 137.2 grams.

16.    For all eleven controlled buys, RECINOS came to the deal driving a car either registered or rented in his own name.

*August 24, 2025: Investigators Seized the Electronic Equipment from RECINOS After RECINOS Was Arrested Selling 5,233 Fentanyl Pills to the CW in Lawrence*

17.    On August 24, 2025, agents directed the CW to contact RECINOS to buy pills.  The CW texted RECINOS ("Dinero," using the 7369 Phone), "Need to see you this week.  Need to get shit.  You got addys [meaning counterfeit Adderall pills] or only the blues?"  RECINOS responded, "I got blues amd I could get A's but yhe numbers is way to high."  The CW and RECINOS negotiated the price over text.  The CW wrote that s/he did not want to pay more than $1 per pill.  RECINOS wrote that the "A's is up rote now . . . It would probably be like 1.20.  The blues I could deff."  RECINOS ultimately agreed to sell 5,000 "blues" to the CW ("Its going be 4k blue and 1k A?" "Naw 5 k Blues . . . I don't wanna pay that much for the As." "Ok.").  RECINOS and the CS agreed on a price of $0.75 per pill.  The two ultimately agreed to meet in the parking lot of a Popeyes restaurant, 600 Winthrop Street, Lawrence.

18.    On August 27, 2025, investigators saw RECINOS leave his employer, a semiconductor manufacturer in Lawrence, at about 3:16 p.m. Investigators saw RECINOS enter a gray Honda Accord, Mass. Reg. 3YEM63, registered to RECINOS (the "RECINOS Honda").  Agents followed the RECINOS Honda to a liquor store and then to RECINOS's house.  RECINOS communicated his progress to the CW via WhatsApp.  At about 5:35 p.m., agents saw the RECINOS Honda pull into the Popeyes parking lot.  A second man, later identified as Angel Ortega, was in the car with RECINOS.

19.    RECINOS got out and entered the CS's car carrying a bag with a package inside it, later determined to be a cereal box.   RECINOS handed the CS the cereal box, which had pills inside packaged in bundles.  In a recorded audio from the within the car, the CS said, "what are these, these in hundreds," meaning were these bundles of pills packaged in hundreds.  RECINOS said yes.  The CW gave investigators a verbal signal.  Agents moved in to arrest RECINOS.

20.    The pills inside the cereal box were analyzed at a lab and found to be 5,233 blue pills weighing **539g** and containing **fentanyl**.



21.    Investigators searched the RECINOS Honda, which had a small bag of powder in it later determined by lab analysis to be cocaine.  Investigators found the black-case iPhone in the center console of the RECINOS Honda.  Investigators found the clear/brown-case iPhone on the ground, under the RECINOS Honda, during the arrest of RECINOS.   Investigators believe

RECINOS dropped the phone while being arrested as it was in his vicinity.  Ortega was not arrested and the phone was not found in his vicinity.

22.    Because the CS communicated with RECINOS's WhatsApp account in the moments leading up to RECINOS's arrival at the Popeyes on August 27, 2025, I believe either the black-case iPhone or the clear/brown-case iPhone will be found to be the 7369 Phone or to otherwise contain WhatsApp messages relevant to RECINOS's commission of the Target Offenses.  I further believe that RECINOS carried the 7369 Phone with him during most or all of the eleven controlled buys described earlier.  I therefore believe that historical cell-site information for the 7369 Phone will confirm RECINOS's presence at the eleven controlled purchases of counterfeit pills conducted in this case, and may lead to the discovery of stash locations used by RECINOS to store pills and/or the locations of coconspirators.

**Probable Cause to Believe that the Electronic Equipment Contains Evidence, Fruits, and Instrumentalities of the Target Offenses**

23.    From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computer equipment to carry out, communicate about, and store records regarding their daily activities.  These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information, including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

24.    Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Apple iPhones like the Electronic Equipment are a type of smartphone. Smartphones have capabilities that include

serving as a wireless telephone, digital camera, portable media player, and GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

25.    In addition, RECINOS communicated with the CS about eleven controlled sales of counterfeit pills using WhatsApp.  Drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept on their persons or at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

26.    From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in mobile phones.

27.    Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

### Historical Cell-Site Information

28.    In my training and experience, I have learned T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the

locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

29.    Based on my training and experience, I know that T-Mobile can collect cell-site data about the 7369 Phone.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

30.    Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the 7369 Phone's user or users and may assist in the identification of co-conspirators.

31.     Based on my training and experience, I know that T-Mobile also collects data about the speed with which signals travel between cellular telephones and cellular towers ("per call measurement data," or "PCMD"). For each cellular telephone accessing its network, providers such as T-Mobile use PCMD and other data to calculate and record the estimated location of that cellular telephone.  T-Mobile refers to the resulting location information as  Timing Advanced Information, and/or Timing Advance Report Date ("True Call").  Provider AT&T refers to this information as NELOS (Network Event Location System) and Provider Verizon Wireless refers to this information as RTT (Round-Trip Timing).

### Authorization Request – Historical Cell-Site Information

32.     Based on the foregoing, I request that the Court issue the proposed historical cell-site search warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.

33.     I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

34.     I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order T-Mobile not to notify any person (including the subscribers or customers to which the materials relate) of the existence of this application, the warrant, or the execution of the warrant, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b).  T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice.   Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert

the targets to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses, or endanger the life or physical safety of an individual. See 18 U.S.C. § 2705(b).

35.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

36.     Wherefore, I submit that there is probable cause to believe that the Electronic Equipment described in Attachments A-1 and A-2 contains evidence, fruits, and instrumentalities of the Target Offenses as described in Attachment B. I further submit that there is probable cause to believe that RECINOS committed the Target Offenses and that the historical cell-site information described in Attachment C will lead to evidence of the Target Offenses.

37.    Based on the foregoing, I respectfully request that the Court issue the proposed search warrants for the Electronic Equipment and the historical cell-site information.

John R. Dunn
Task Force Officer
Drug Enforcement Administration


Sworn via telephone in accordance with Fed. R. Crim. P. 4.1,

HON. DONALD L. CABELL
CHIEF UNITED STATES MAGISTRATE JUDGE

12/9/2025

**ATTACHMENT A-1**

The equipment to be searched consists of the following:

An iPhone in a clear/brown case, seized from the ground underneath a gray Honda Accord, Mass. Reg. 3YEM63, in the parking lot of 100 Winthrop Ave., Lawrence, Mass., on August 27, 2025 (the "clear/brown-case iPhone");

The clear/brown-case iPhone is located at the Drug Enforcement Administration, 40 Middlesex Turnpike, Bedford, MA 01730.   The clear/brown-case iPhone is depicted below:





**ATTACHMENT A-2**

The equipment to be searched consists of the following:

An iPhone in a patterned black case seized from a gray Honda Accord, Mass. Reg. 3YEM63, in the parking lot of 100 Winthrop Ave., Lawrence, Mass., on August 27, 2025 (the "black-case iPhone").

The black-case iPhone is located at the Drug Enforcement Administration, 40 Middlesex Turnpike, Bedford, MA 01730.   The black-case iPhone is depicted below:





**ATTACHMENT B**

<u>Items to be Seized from the Electronic Equipment</u>

All records and data from August 1, 2024, to September 1, 2025, in any format whatsoever (digital, electronic, or otherwise) that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846 and 841 (drug conspiracy and drug distribution), including, without limitation:

    a. Names and contact information that have been programmed into the device (including but not limited to contacts lists) of individuals engaged in drug trafficking;

    b. Records and data related to the payment, receipt, transfer, or storage of money or other things of value by Randy RECINOS, including:

        i. Bank, credit union, investment, money transfer, and other financial accounts;
        ii. Credit and debit card accounts;
        iii. Business or personal expenses;
        iv. Income, whether from wages or investments; and
        v. Loans;

    c. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device;

    d. Text messages both sent to and received from the device (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

    e. Incoming and outgoing voice mail messages both to and from the device relating to or referencing drug trafficking or individuals engaged in drug trafficking;

    f. GPS data;

    g. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

19

h.  Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

i.  All data within the device evidencing ownership, possession, custody, control, or use of the device;

j.  Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above;

k.  Evidence of malicious computer software that would allow others to control the equipment, software, or storage media, evidence of the lack of such malicious software, and evidence of the presence or absence of security software designed to detect malicious software;

l.  Evidence of the attachment of other hardware or storage media;

m.  Evidence of counter-forensic programs and associated data that are designed to eliminate data;

n.  Evidence of the times the equipment was used;

o.  Passwords, encryption keys, and other access devices that may be necessary to access the equipment;

p.  Records relating to accounts held with companies providing Internet access or remote storage of either data or storage media;

q.  Records relating to the ownership, occupancy, or use of the location from which the equipment was obtained by law enforcement investigators; and

r.  Serial numbers and any electronic identifiers that serve to identify the computer equipment.

## DEFINITIONS

For the purpose of this warrant:

A.    "Equipment" means any hardware, software, storage media, and data.

B.    "Hardware" means any electronic device capable of data processing (such as a computer, digital camera, cellular telephone or smartphone, wireless communication device, or GPS navigation device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.    "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

E.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.    "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

### Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally identifying information of victims; or the fruits or instrumentalities of crime.

**ATTACHMENT C**

This warrant applies to records and information associated with the cellular telephone 978-390-7369, subscribed to Randy R. Recinos, 120 Phillips St., Lawrence, Mass. 01843, that are stored at premises controlled by T-Mobile ("the Provider"), headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2

**ATTACHMENT D**

Particular Things to be Seized

## I.    Information to be Disclosed by the Provider

To the extent that the information described in Attachment C is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment C for the time period August 1, 2024, through September 1, 2025:

a.   The following information about the customers or subscribers of the Account:

  i.   Names (including subscriber names, user names, and screen names);

  ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

  iii.   Local and long distance telephone connection records;

  iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

  v.   Length of service (including start date) and types of service utilized;

  vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

  vii.   Other subscriber numbers or identities (All Internet Protocol (IP) address, email address, email logs (without content such as the body of the email or subject lines), website address, servers, usernames, WiFi hotspot

3

locations, Wi-Fi ID history, and IP history location, including user identifying information and communications to and from the Account listed in Attachment C; and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Accounts, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii. Call detail records to include numbers dialed, incoming numbers, call durations, signaling and communications processing information, geographic locations of towers and sectors activated, sent and received by the Account, for any form of communication it is capable of including: voice, VoIP, VoLTE, text, SMS, MMS, internet, mobile-to- mobile, any push to talk feature, non-billed calls, uncharged call detail, airtime usage data, Automated Message Accounting records and data bases, calls-to-destination data and packet data, as available without communications content and excluding post-cut-through dialed digits);

iii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent;

iv. Cell site data, including any data reflecting: the cell towers and sectors thereof utilized in routing any phone, text, or data communication to or

4

from the Account; the approximate range of the Account from the cell

towers during the communication (including per-call measurement data

"PCMD", round-trip time "RTT" data, Historical Mobile Locators

"NELOS", Timing Advanced Information, and Timing Advance Report

Date ("True Call").

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of

21 U.S.C. § 841 (distribution of controlled substances) and 21 U.S.C. § 846 (conspiracy to

distribute controlled substances, involving Randy RECINOS and others known and yet unknown

during the period August 1, 2024, through September 1, 2025.

Law enforcement personnel (who may include, in addition to law enforcement officers

and agents, attorneys for the government, attorney support staff, agency personnel assisting the

government in this investigation, and outside technical experts under government control) are

authorized to review the records produced by the Provider in order to locate the things

particularly described in this Warrant.

**This warrant does not authorize the collection of any content of any**

**communications.**